The next case will be Programmers Guild et al. versus Shirtoff. Mr. Miyano. Yes, Your Honor. May it please the Court, I'm John Miyano. We're representing the appellants. Judge Fischer, I'd like to request four minutes for rebuttal. That request will be granted. Okay. Thank you. Your Honor, the subject of this action is a regulation governing student visas where the findings make absolutely no mention of educational purpose, a role in the purpose is to supply labor to industry but ignores the restriction on the enabling statute that authorizes admission solely for the purpose of study. A role whose justification is to solve alleged labor shortages, but whose findings cannot establish a labor shortage. And a role that was dropped on the public without any advance notice or comment, even though the agency had a self-imposed deadline of over a year. That's what we're dealing with here. This is what I'd like to tell you about us. We are computer programmers, scientists, engineers. How many? In the Programmers Guild there's about 1,500. Your clients. Excuse me? Your clients. How many clients do you have? We have 12 individuals and 3 corporate groups. I'm simply trying to determine the hardship that you claim your clients are suffering. How many STEM people do you actually represent here today? Can you give me an estimate? We are aware of about 2,000 STEM people altogether. About 2,000 STEM people. Okay. Altogether, Your Honor. So we're computer scientists and engineers and organizations representing those fields. And these are collectively called STEM fields in the record, although that's not a term that we use ourselves. I'll illustrate. For example, our plaintiff, David Huber, taught us about computers while he was at the University of Chicago. And now sells his services around the country in network engineering. So his job serves as a continuous process of finding new work. Our John Marson is an electronics engineer. He has 30 years of experience in the industry, in aviation, primarily companies like Rockwell, Lockheed. And he, like so many of us, is unemployed. So that's who we are, tech workers of this general nature. And because of disparities in wages around the world, employers are able to find foreign workers who can come to the U.S. for lower wages. And the primary mechanism for importing STEM workers is the H-1B visa program. In recent years, the demand for cheap foreign labor has been so great that industries use quotas on H-1B visas faster and faster. After Congress rejected expanding guest worker programs in 2007... Now, Mr. Miano, because I don't want you to run out of time. It seems to me the problem you have here is a district court determined that your clients don't have standing to challenge this regulation. And she also held on the merits of the case itself. Okay. But why don't you address the standing issue first? Okay. Well, I want to give you a background. We know the background. For standing here, we've alleged that adding more foreign workers creates increased competition. Adding more foreign workers to the labor pool benefits the industry by providing more workers. How many a year? How many a year? Sir, let me finish my question, please. With this interim rule, how many additional STEM workers are we going to have? As I read the record, it's approximately 23,000. Is that about right? Your Honor, the answer is we don't know. In fact, there are three different answers given in the record. At one point, it says tens of thousands. At one point, it says 12,000. At another point, it says a substantial number. The real answer is we just don't know. Well, we know that DHS estimates that there are 642,000 F1 students every year. Is that correct? That's what they say in their findings. And that 70,000 of them are in the OPT program. Is that correct? That's what they say, Your Honor. And about a third of them, or about 23,000, have earned a STEM degree. Is that right? That's what they say, Your Honor. Okay. And DHS estimates that about 12,000 of them will apply for a 17-month extension. Correct? That's correct, Your Honor. Now, tell me how that creates a harm to your client that allows you to proceed here in court. Your Honor, first of all, the numbers you're talking about are typical of this battle. And this is just one skirmish in a larger battle as far as wages. And typically, when we deal with congressional legislation, we're talking in increments of tens of thousands. For example, the last increment in the H-1B quota was 20,000. So this is typical of that. The second thing is that in the competitive injury cases, it's just been an allowance of competition has created standing. Now, you've got 12,000 people staying an extra 17 months nationwide. And the estimate is, again, DHS estimates that there are in the neighborhood of 5.5 million STEM workers in this country. How is the presence of 12,000 people for an additional 17 months give you standing? Your Honor, increased allowance of competition under Association of Data Processing Service Organizations versus CAMP is an injury in fact, according to the report. What evidence is there that your clients have not been employed because of the presence of any STEM workers? Is there anything? Your Honor, yes, there is, Your Honor.  Your Honor, we've had clients who've applied to these positions that currently companies are out putting advertisements that we're only seeking workers on this optional practical training program. We've had people apply to these positions and then they say and they get rejected. A typical thing that happens is that… Is that part of the record? That's not part of the record. So how can we consider that? You can't. We've not been able to present that factually. Okay. So we were… But when you talked about the district court deciding this on the merits, they cited it on the merits on the basis that you didn't state a claim for relief, which means that some of what you're saying here isn't in your complaint. Those allegations we've had people who have faced discrimination are in the complaint. What form of discrimination? Nationality discrimination and immigration status discrimination. Can I ask you maybe to switch gears a little bit? That's different than… Excuse me. That's just different than… I'm sorry. That's different than the injury that you described from this regulation, which extended the present 17 months. Your Honor, I didn't really understand the question. I said that's different than… You said there's nationality discrimination. That's not discrimination. It came from the fact that the students were allowed to stay, could be allowed to stay an additional 17 months under this regulatory change. Well, it enables it, Your Honor. If they didn't have access to this pool of workers, they wouldn't get it. They wouldn't be able to do this. Okay. So that's the kind of nationality discrimination you're talking about? Yes, Your Honor. All right. Okay. Yeah. Switch gears just a little bit to prudential standing. I'm a little concerned about the zone of interest. Now, you cited something in your brief, Section 1… as a relevant statute, Section 1182A5A1. Okay. But I'm looking at your complaint. The only statute you cite is 1101. That's the F1 provision. Which is the relevant statute? Well, Your Honor, they're all part of the entire Immigration and Nationality Act. 1101 is the specific… Section 8 U.S.C. 1101 is the specific authorization for various non-immigrants of all times. Section 8 U.S.C. 1182 gives the labor certification standards for various different work authorizations. The Section 8 was the general statement of law. Farther down at 8 U.S.C. 1182N is the specific requirements for H-1B workers. So how do you fall within the zone of interest? Okay. Within the zone of interest, protecting the interests of U.S. workers, the wages and working conditions, is an expressed interest of this Act here. As you can see, it says that no one can be admitted without showing that they are not going to adversely affect the wages and working conditions of U.S. workers. Farther down… That's one section. That's one section. Farther down in Section N, where it deals specifically with the type of worker generally that we're dealing with here, it says that before importing a foreign worker on an H-1B visa, you have to go through a labor condition application process where you show that they're paying a prevailing wage and they're not going to be having an adverse effect on the local work market. What's your best reported case to support you, that you were within the zone of interest? International Longshoremen v. Meese, which the facts are nearly identical to the case here. Again, that protection of the wages and working conditions were within the zone of interest of the Act. International Brook… Actually, I gave you the wrong case. That is one case. Okay. International Brooklayers v. Meese is another case. That's the case where the facts are nearly identical to the ones here. The INS v. Wang is another case. All these have addressed the Immigration and Nationality Act and have held that this type of injury is within the zone of interest of that Act. Have I answered your question with regard to standing, Judge Fischer? No, you've addressed some of the issues, yeah. Thank you. Since you asked, let me speak about… My time's running out, so I'll have to go very quickly. In Brooklayers v. Meese, the facts are almost identical to the situation here. The allegation was adding more Brooklayers creates an injury. In fact, district court held that there was such an injury fact, and the application of the injury and fact rules was applied to the competition, that it was likely that competition would occur by allowing these foreign workers to come in, and it was likely to be redressed because those foreign workers would be sent back. I see my time is up. And we'll have you back on rebuttal. Thank you very much, Your Honor. Mr. Goh? Thank you. May it please the Court? First of all, I'd like to apologize. I am fighting a cough. Your Honor, the district court correctly dismissed this matter on grounds that plaintiffs lack standing. They correctly found the three elements of… All right. If these particular parties don't have the ability to challenge this regulation because they don't have standing, who is going to have the ability to challenge it? Your Honor, it's not necessarily – well, these parties, because they're job applicants, they do not have standing. But more importantly is that they have not alleged the proper elements for standing, which is they have not cited any specific instances, any specific injuries, in fact, that are caused by this extension by the IFR. Well, they've alleged that the labor pool is certainly bigger by virtue of the 17-month extension given to these foreign students, have they not? Yes, they have alleged that. I mean, they've alleged that they're part of that labor pool, they're part of that group of STEM workers as they're identified in this record. Yes. My question is, if they can't challenge this, who can? Your Honor, I believe the problem with this also lies in the fact that these are job applicants. These are people that don't have the best interests. To just contrast with the cases that he cited with bricklayers and with international longshoremen, these were people that were workers, that were employees of a company. And this goes along with the competitive standing doctrine that businesses and employers have an interest. Job applicants can be anybody. And on that basis, along with that, these job applicants, anyone can actually come in and say, you know, this increased application gives me standing because I've been injured in that manner. It's similar to a generalized grievance that a taxpayer would grant. Is your answer to Judge Isher's question that people who actually hold the jobs might have standing? Is that what I'm saying? They would have a better case for that. But I think the bottom line here is that all three of the elements have not been pled. The injuries specific here that they've alleged are wage depression, displacement, lost job opportunities, and employment discrimination. And in terms of those injuries constituting the kind of- There are cases that have said that businesses can gain standing by showing increased competition from regulatory changes. Are there not? Yes. Why should a worker be treated any different than a business entity? Because this is-a business has a vested interest. They are part of this industry that's being regulated. A job applicant doesn't have any interest to begin with. There is no sort of entitlement to- And he's not going to have any interest if he doesn't get a job. There's no entitlement to a job where it is that person's right to have a particular job. How does that differ from a business? Is a business of any right to a particular piece of business from another company by-versus the competition it may suffer from a break being given to another business being allowed to enter a field? I mean, how do-I just don't see the distinction that you're arguing here. Your Honor, I guess the distinction is that this competitive standing document has only been applied in particular businesses. That's the only thing that's- Is there anybody-is there any case that says we can't apply it to a case like this? There's no case where it's been shown to apply to job applicants. No. To answer your question, no. There's not been a case where they've definitively decided that, oh, it doesn't apply to job applicants because no case has been brought up bringing this issue forth. But I think the reason being is that this has been a very limited doctrine, solely-primarily only in one circuit, the D.C. Circuit, and with respect to businesses. All right. What about the zone of interest? Should we be looking at the regulation or should we be looking at the statute in determining the zone of interest? You should be looking at the regulation. And plaintiff's argument that you should be looking at the whole INA does not hold because the INA is such a complex body of law and there's multiple purposes for that. In fact, there's a case, Tax Analyst and Advocates v. Blumenthal, where it states where a statute doesn't have a single unified purpose, but it's intended to accomplish a wide variety of goals, the court should just look at the particular section, the statutory section, to apply the zone to us. And with the INA, there are different purposes. And, of course, one of the purposes is to further the national interest, which this particular regulation does. The stated purpose of the IFR is to improve the United States' competitive position for particular workers. Well, so what's the relevance then of what your adversary pointed out about the secretary certifying whether whatever it is is going to adversely affect the wages and working conditions? I mean, that's the one they're relying on, 1182A5A1. Yeah, that's not the correct statute to rely upon. The correct statute to rely upon is a regulation. Even the underlying statute is the F-1 visa, and both of those do not – the zone of interest do not contain the interests of what plaintiff is responsible for. So is it appropriate to rely on a regulation or order as opposed to a statute? Doesn't the case law talk about relying on a statute or statutory provision? Your Honor, I believe that would primarily rely on the regulation. If you want to look at the statute, that would also show that plaintiffs' concerns are not within the zone of interest. What else could have these plaintiffs possibly alleged that would have given them standing under your argument? For one, Your Honor, they could have alleged specific instances of how this particular regulation affected them. Didn't they at least allege in one instance where an employer said they were only interested in considering the foreign students for employees? Wasn't that alleged in the complaint?  The only thing that they alleged, they put forth job ads that said that we're – I guess we're targeting OPT students. But that shows nothing in terms of whether the IFR, which is just a 17-month extension, was the cause of that particular ad. Several times plaintiff has confused the 17-month extension, which is at issue here, with the OPT program itself. Now, since you agree that there are certain things that could be alleged that might bring them within – which would give them standing, should they be granted leave to amend their complaint? Your Honor, I don't believe that they should be granted leave to amend. I don't see how they can – Well, why not? Well, I don't see how they can amend their complaint in a manner where these are – where they have – where they can establish standing. Did the district court find that it would be futile? Your Honor, I don't think that they did find it futile specifically in the order. Did the plaintiffs ask for the opportunity to amend? I don't believe that they did at the time. Do you want to deal with the good cause? I mean, why was there a good cause for this shortcut of the rulemaking process? Well, Your Honor, the good cause is in the language of the IFR itself. There was an emergency situation. Yeah, but your adversary points out that this emergency was a long-ranging – I mean, temporally long. It was not an overnight thing. In fact, they point out they had over a year's worth of notice. I mean, why not go through the regular procedure? Well, I disagree with Plaintiff's discussion about that. There were – there was a trend where H-1B visas were getting filled up at a greater pace, but it was in 2007 where it reached a point where it was filled up on the first day. These things fluctuate, and in fact, this past year, it did not get filled up immediately. So in terms of this, when DHS discovered that there was a situation that had to be dealt with, they felt it necessary, and in the best interest of the nation, to promulgate this regulation and ask for notice and comment afterwards with the intent that – with the purpose that these visas that were about to expire and these people that were going to have to leave the country would not have to because of this cap gap. Well, I don't know. It seems to me the good cause exception is – should be only applied in exceptional circumstances, and it seemed like there was a lot of notice. I would think this – I believe this is an exceptional circumstance. There was a dramatic increase from – in terms of the H-1B applications from prior years to 2007. Okay. Do you have anything else, Mr. Goh? Your Honor, I would just like to briefly just go through the other elements, unless – It's up to you. You have time. Okay. Your Honor, I just wanted to state that, again, with the injuries that were pleaded, there were no specific instances that were alleged, and they also failed to establish a causal connection between the IFR and the alleged injuries. They would need to show how the IFR, this extension, caused their unemployment or underemployment, how it caused their wages to be depressed and caused them to be discriminated by employers, and they haven't shown that. Along that – along those lines, with redressability, another element of constitutional standing, the question has to be asked, would invalidating the IFR necessarily redress their injuries? And for the most part, it probably does not. We have no idea of the qualifications of these people. They could be the least qualified. They could be the most qualified. Either end of the spectrum, the IFR may not have any effect on any of their claims. We did address prudential standing. Along with just briefly addressing the failure to state a claim, the IFR was promulgated under express statutory authority. DHS was given the authority to determine time periods that aliens would stay. And in terms of good cause, what is needed is that they're alleging that DHS was acting arbitrarily and capriciously, and we put forth a proper reason in the IFR itself. Again, this is to further the national interest, to improve the competitive standing of the United States in relation to other countries, and also to make the OPT program more attractive and to allow OPT students that do wish to stay, but to stay in status, but are forced to leave because of this cap gap, to allow them to stay and continue their studies and their work here. Thank you very much. Thank you, Mr. Goh. Thank you very much. Mr. Miano, do you have anything on rebuttal? Yes, quite a number, Your Honor. First of all, I'd like to briefly talk about the merits, because you brought up the timing issue. They claim that they became aware of this problem on April 2, 2007. The rule was implemented on April 8, 2008. There's no case where that kind of notice has given rise to good cause. When this Court has given good cause to build up its citizen action, the deadline was 49 days. In Sharon Steele v. EPA, the deadline was just three weeks longer, and this Court did not give cause. Second, the zone of interest test. The serving court is very clear that it's supposed to be applied with statute, not the rule. If it wasn't, you wouldn't be able to do it. Also, I'd like to point out that we had to bring this case as soon as possible, so this case actually brought before any impact is going to be felt, because this needed to be stopped before it took place. As you can see, the adverse consequences would have having this rule declared unlawful now versus before it starts and is taking place. With regard to the zone of interest, I'll quickly point out, a primary purpose of the immigration laws, their quotas, and certification process is to protect U.S. workers. That's from the international law in Sherman v. Meese. In regard to this competition only applying to business, that just doesn't reflect the case law. Unions satisfied the injury and fact test because increased competition might have an adverse effect on employment opportunities of postal workers. U.S. Supreme Court Air Courier Conference versus American postal workers. Because of foreign competition, ILW members have lost an opportunity to compete for what they contend are traditional jobs. Again, increased competition. International law, Sherman v. Meese. I go on and on, Otter Law v. Lair. And in fact, you can go back to Kern v. Lair in the D.C. Circuit from 1969, where the courts were recognizing competition to labor was an injury in fact before they were actually recognizing it as an injury to businesses. This distinction just simply doesn't exist in the case law. And in regard to the redressable injury, competition is an injury in fact in itself in the case law. It's been consistently held that way. The courts have not required that people show a specific instance that they've been made unemployed or put out. It's Clinton v. New York, the Supreme Court case. Your Honor, Clinton v. New York was the Supreme Court general case in regard to economic injury. It's saying that anyone who suffers an injury is likely to have standing. But there have been quite a number of these cases. Bricklayers is an example where the government made this exact same argument and was rejected. In Adams v. Watson, the government was making the same argument. It was rejected. It's been this type of thing about tracing the injury past competition to the actual harms has been made repeatedly. It's only been accepted in a few district court cases and has never survived on appeal. At least, I hate to go on that to say there's no case law because my pop-up, but I've been looking at this case law for now for a year and looking at this, and I have not found a single case where, and I'll take that, but I've only found one case where increased competition was not an injury in fact, and that was a Sixth Circuit case interpreting Ohio law. In every other case where there has been increased competition, it has given rise to an injury. And I'd also like to point out that the Programmers Guild, the Professional Organization for Programmers, the American Engineering Association, the Professional Organization for Engineering, the New Yorker's Bright Research Jobs, the Professional Organization for Scientists, and other tech workers were not all unemployed. I just want to make that clear. We represent a variety of circumstances, and not even all the named plaintiffs are unemployed. So I'll leave it there. I see my time is up, and I thank you for giving this case its first hearing. All right. Well, we thank you very much, Mr. Miano, and we thank both counsel for excellent arguments, and we'll take the matter under advisement. Everybody okay? Yep. All right.